U.S DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

AUG 2 9 2008

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

VANESSA NOAHUBI

VERSUS                                    CIVIL ACTION NO. 06-2196
                                          JUDGE TOM STAGG
DR. KENNETH B. JONES, JR.

## MEMORANDUM RULING

Having heard the oral testimony presented and read the exhibits submitted by the parties, including reviewing the quite extensive medical records, the court makes the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52 and rules as follows:

## I. FINDINGS OF FACT

The findings of fact are drawn largely from the parties' stipulations. Facts additional to those stipulated have been found by the court from the testimony and exhibits received in evidence and from credibility choices common in every trial.

On Monday, November 11, 2002, Dr. Jones performed gastric bypass revision surgery at Doctors Hospital of Shreveport on Mrs. Vanessa Noahubi ("Mrs. Noahubi"). At the time of the surgery, Mrs. Noahubi was 42 years old, five feet, three inches in

1

height and weighed 233 pounds. At all relevant times, Dr. Kenneth Jones ("Dr. Jones") was a duly licensed physician in Louisiana and a qualified health care provider under the Louisiana Medical Malpractice Act. It is significant that Mrs. Noahubi had undergone previous gastric bypass and gastric reflux procedures in Oklahoma in the mid 1990s but she had since regained weight and turned to Dr. Jones for her revision surgery.

After consultation, Dr. Jones concluded that Noahubi was a candidate for the gastric bypass revision surgery. The bariatric bypass revision operation on Monday, November 11 took approximately five hours and was more tedious and difficult than normal due to the previous surgeries that had created dense adhesions. After surgery, Mrs. Noahubi experienced problems with nausea, dry heaving and vomiting, which are not uncommon side effects. Dr. Jones ordered antibiotic therapy.

At 2:15 p.m., on Tuesday, November 12, a nurse's notes indicated an above-normal pulse rate of 129, medically termed "tachycardia," which is defined as an accelerated heart rate (normal range is between 60 and 100). At 2:25 p.m., the nurse's notes reflect that Mrs. Noahubi complained of "discomfort mid-chest," and at 5:40 p.m., Mrs. Noahubi reported chest pain, as well as new onset of shortness of breath. Mrs. Noahubi had been out of bed ambulating in the hallway earlier in that afternoon.

On Wednesday, November 13, lab work at 6:25 a.m. indicated that Mrs.

Noahubi's white blood cell count was elevated at 16.6 (normal range is between 4 and 10) and at 4:45 p.m. she was running a temperature of 103 degrees. Lab work results at 5:05 p.m. that day continued to reveal an elevated white blood cell count at 15.3. A progress note from Dr. Jones on November 13 reflects that he came to the bedside to evaluate Mrs. Noahubi and noted that she was tachycardic (pulse 120) but he documented no abnormal findings on examination. Dr. Jones ordered a chest x-ray which was interpreted to show ". . . a hazy infiltrate at the right base consistent with pneumonia versus early congestive failure." He also ordered blood cultures, antibiotic therapy and aerosol breathing treatments.

Lab work returned for the shift of Thursday, November 14 at 6:10 a.m. showed Mrs. Noahubi's white blood cell count was 11.5. At 10:10 a.m., Mrs. Noahubi complained of pain at the operative site and in her right lower chest area. At 11:15 a.m., Mrs. Noahubi continued to complain of chest pain and reported feeling "panicky." The nurse immediately notified Dr. Jones. New orders were written to adjust Mrs. Noahubi's respiratory therapy medications. Dr. Jones confirmed a pulse of 96 in his progress note of November 14. The graphics chart reflected a range of 99 to 103 pulse rate, and indicated a rapid respiratory rate in the range of 20 to 22.[1]

---

[1] The medical term for a rapid respiratory rate is "tachypnea." The court notes that when plaintiff's expert, Dr. Bruce Applebaum, was asked what range he would qualify as tachypnea, Dr. Applebaum responded: "Above 25. I actually don't know,

Dr. Jones evaluated Mrs. Noahubi on Friday, November 15 at her bedside at 7:30 p.m. and noted that her abdomen was soft. At 9:15 p.m., the nurse gave more Percocet for complaints of "surgical pain," and Mrs. Noahubi was encouraged to continue ambulating. The graphics chart shows vital signs of pulse in the range of 96 to 103, and respirations in the range of 18 to 20. A repeat chest film was ordered.

The morning labs of Saturday, November 16 returned at 6:20 a.m. and showed Mrs. Noahubi's white blood cell count was 14.4. Mrs. Noahubi also continued to require pain medication for the shift, and the graphics chart shows vital signs for pulse in the range of 96 to 108, and respirations from 18 to 20. When Dr. Jones saw Mrs. Noahubi on Saturday, the results of the chest x-ray he ordered on his Friday visit were not in the chart. Dr. Jones went off call on Sunday and his on-call partner, Dr. Blaine Pittman, took over that day.

On Sunday morning, Mrs. Noahubi complained of abdominal pain which she rated an 8 out of 10. She was given Percocet and Advil and encouraged to use pursed lip breathing. A pulse ox (measuring the oxygen saturation of the blood) revealed a value of 92 percent and oxygen was continued at 2 liters by nasal cannula. At 6:20 a.m., the lab work returned. It showed that Mrs. Noahubi's white blood cell count was

---

I can't recall the exact number where, say, a pulmonologist or somebody would say it's tachypneic, but it's above the 25 range." Record Document 53, Trial Transcript Day 1 at 53.

now normal, at 9.6. At 9:40 a.m., Noahubi was taken for a repeat chest film and the study continued to demonstrate " . . . large right sided pleural effusion, grossly unchanged . . . underlying infiltrate, mass, or atelectasis[2] cannot be excluded . . . repeat study after resolution of pleural effusion[3] or thoracentisis might be helpful to rule out underlying pathology." The radiology report was also reviewed by a respiratory therapist, who entered the following written progress note to Dr. Jones regarding an assessment performed at 9:00 p.m.

> . . . Dr. Jones -- [breath sounds] are more on right, now since I last had her (now with fine inspiratory crackles) on friday. Pt's sao2 [oxygen saturation] was 76% while ambulating -- room air, and 86% on [room] air at rest. Pt was very [short of breath]. X-ray shows large right sided pleural effusion as of 11/15/02.

On Monday, November 18, Dr. Jones returned and evaluated Mrs. Noahubi and, after noting the results of the November 15 chest x-ray, immediately consulted a pulmonologist, Dr. John Areno ("Dr. Areno"). At 2:30 p.m., Dr. Areno presented for the pulmonary consultation. He noted that the patient was still running a low grade temperature at 101.4 degrees, and an exam of her abdomen revealed tenderness, mainly

---

[2]Atelectasis is was defined by the parties in their joint exhibit medical glossary as: (1) collapse of the expanded lung or (2) incomplete expansion of a lung.

[3]Pleural effusion was defined by the parties in their joint exhibit as (1) an exudation of fluid from the blood or lymph into a pleural cavity or (2) an exudate in a pleural cavity.

at the surgical site. His impression was either possible pleural effusion or pneumonia following the gastric bypass procedure. Dr. Areno ordered a CT scan of the chest, which showed fluid and lung compression and also some air/fluid levels in the bowel loops. Dr. Areno felt that Mrs. Noahubi needed surgical intervention that evening which would necessitate a transfer to Christus Schumpert Hospital.

Dr. Jones noted that he discussed Mrs. Noahubi's condition with Dr. John Gladney ("Dr. Gladney") (a chest surgeon) and that they felt that the findings on the CT scan were suspect for loculated empyema (the presence of pus in a bodily cavity). Dr. Jones also noted that a gastrograffin study (an esophagram or upper GI series using water-soluble iodinated contrast medium) would be performed that evening.

Mrs. Noahubi was transferred to Christus Schumpert for a gastrograffin swallow, which confirmed two leaks at the gastrojejunal anastomosis (the connection between the stomach pouch and the small intestine). She was immediately taken to surgery by Drs. Gladney and Jones to repair the leaks. In addition, a thorascopy (an endoscopic examination of the chest wall and surface of the lung) and right thoracotomy (surgical incision of the chest wall) with complete pleural decortication (the surgical removal of the cortex of an organ, an enveloping membrane, or a constrictive fibrinous covering) was performed by Dr. Gladney.

On December 17, Mrs. Noahubi was discharged and transferred to Dubuis

Hospital (a long-term care part of Christus Schumpert Hospital) for care related to continued chest tube placement requiring chronic care; continued PICC (peripherally inserted central catheter) line antibiotic therapy; continued nutritional therapy with tube feeding; continued wound care; and physical therapy when appropriate. Mrs. Noahubi was discharged from Dubuis Hospital on December 31.

## II. CONCLUSIONS OF LAW

Mrs. Noahubi is asserting a claim of medical malpractice against Dr. Jones pursuant to the Louisiana Medical Malpractice Act. This medical malpractice claim based on the negligence of a physician is governed by Louisiana Revised Statute 9:2794(a).

To prevail on such a claim, the plaintiff has the burden of proving the degree of care ordinarily practiced by a physician in the involved specialty, that the physician either lacked this degree of skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and that as a proximate result of the breach the plaintiff suffered injuries that would not otherwise have been incurred. See Elliott v. Robinson, 612 So. 2d 996 (La. App. 2d Cir. 1993). According to Louisiana Revised Statute, Title 9, section 2794(a)(1), where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the

plaintiff has the burden of proving the degree of care ordinarily practiced by physicians within the involved medical specialty. Additionally, according to Tarbutton v. St. Paul Fire & Marine Ins. Co., 803 So.2d 273 (La. App. 2d Cir. 2001), a physician is not held to a standard of absolute precision. Rather, his conduct and judgment are evaluated in terms of reasonableness under then-existing circumstances, not on the basis of hindsight or in light of subsequent events.

In this case, the court notes that there existed a unanimous opinion from a medical review panel that Dr. Jones did not breach the standard of care. Louisiana Revised Statute, Title 40, section 1299.47(h) provides that any report of the expert opinion reached by the medical review panel shall be admissible as evidence, but such expert opinion shall not be conclusive, and the relevant jurisprudence essentially equates the findings of the medical review panel to that of an expert. Thus, this court may accept or reject the opinion of the panel after weighing and evaluating the testimony.

The court first turns to the question of whether the treatment Mrs. Noahubi received from Dr. Jones breached the applicable standard of care. As stated in Gordon v. La. State Univ. Bd. of Supervisors, 669 So.2d 736 (La. App. 2 Cir. 3/1/96), expert witnesses who are members of the medical profession are necessary sources of proof in medical malpractice actions to determine whether the treating physician

possessed the required degree of skill and knowledge or failed to exercise reasonable care and diligence in a given case.

This case can be summarized as a "battle of the experts." It is a classic example of what happens when the result turns on opinion evidence. The expert opinion offered by the defendant and the opinions of those on the medical review panel were in conflict with the medical expert presented by the plaintiff to support her theory of negligence and causation. This, in the court's view, is not a reflection upon the integrity of the individual expert witnesses or of the medical profession. Rather, it demonstrates the fact that the practice of medicine is not an exact science. There are inevitable differences of opinion within the profession as to the diagnostic tests which should be conducted in a given set of circumstances and as to the appropriate diagnosis when a set of objective symptoms are set forth.

Dr. Bruce Applebaum ("Dr. Applebaum"), a practitioner from El Paso, Texas, was presented by the plaintiff as an expert. Dr. Applebaum is board certified in general surgery and stated that bariatric surgery was the main focus of his practice. Dr. Applebaum has been performing bariatric surgery since June of 2001 but began practicing general surgery in 1997. Dr. Applebaum's training in bariatric surgery was primarily composed of a three-day lecture course in Cincinnati in March of 2001 and a one-week training course in San Diego in August of 2001. By November of 2002,

when Mrs. Noahubi's surgery occurred, Dr. Applebaum had performed approximately 75 bariatric surgeries. As of the date of his trial testimony, Dr. Applebaum had performed over 1,000 bariatric surgeries. In his testimony, Dr. Applebaum specifically stated that he believed that there was a delay in the diagnosis of Mrs. Noahubi's leak and that this delay was a deviation from the standard of care in existence at the time of Mrs. Noahubi's surgery. See Record Document 53 at 62. When asked what factors were present that were indicative of a possible leak, Dr. Applebaum listed sustained tachycardia of more than 120 for greater than four hours, signs of respiratory insufficiency, complaints of shortness of breath and fever. See id. at 63. He stated that those signs, in congruence, were signs of a possible leak. See id. Dr. Applebaum noted that Mrs. Noahubi exhibited those signs and symptoms beginning November 12 and continuing into November 13. See id. Dr. Applebaum believed that a gastrograffin swallow should have been done on the 12th or 13th of November (as opposed to the 19th) to determine whether Mrs. Noahubi had a leak based on those signs and symptoms. See id. at 64. Dr. Applebaum did, however, admit the fact that a leak can occur under the best of circumstances. See id. at 83. Dr. Applebaum also admitted that patients who do not have a leak can have fever or tachycardia or chest pain. See id. at 111. He nonetheless concluded that Dr. Jones fell short in not timely ordering a gastrograffin swallow or taking steps to identify a

leak within the November 12-13 time frame. See id. at 118. Thus, the issue becomes whether Dr. Jones breached the standard of care in his treatment of Mrs. Noahubi between November 12 and November 19, the date on which the leak was ultimately discovered.

The plaintiff next called Dr. Brian Dockendorf ("Dr. Dockendorf"), who was a member of the medical review panel. Dr. Dockendorf is board certified in general surgery. In his testimony before the court, Dr. Dockendorf disagreed with Dr. Applebaum's conclusion that the standard of care had been violated, stating that he agreed that Dr. Jones met the standard of care. See Record Document 53 at 126. Dr. Dockendorf (and all other witnesses) referred to the graphics chart from Doctors' Hospital, which contained intake and output records, including, inter alia, pulse, respiration and blood pressure measurements. Dr. Dockendorf noted that the graphics chart and nursing notes revealed a patient who appeared to be clinically improving and that, although there were some changes in Mrs. Noahubi's medical condition on the 13th of November, appropriate studies and treatment were ordered and the patient improved. See id. at 165. He stated that the medical review panel felt that Dr. Jones met the standard of care for treating this patient. Dr. Dockendorf explained that while Mrs. Noahubi did have signs that could have been attributed to a leak, the signs were non-specific and she also had signs that could have indicated other medical issues.

See id. at 132. Thus, she had a chest x-ray at the time and was placed on antibiotics, which caused her to improve. He pointed out that a doctor is treating the patient day by day. See id. at 139.

Next on the stand was Dr. Areno, who was a treating physician of Mrs. Noahubi and who is board certified in pulmonary and critical care and was tendered by the plaintiff as an expert in such. When asked whether he saw anything in the chart or if he knew of anything that would indicate that Dr. Jones failed to meet the standard of care, Dr. Areno replied, "No sir, I don't." Record Document 53 at 191. When further asked whether the clinical surgical judgment of Dr. Jones was appropriate in this patient, Dr. Areno replied, "Yes." Id. at 194. Dr. Areno's testimony also confirmed that leakage out of a gastrojejunal juncture going into the right cavity was very uncommon and that the chest x-rays that were taken indicated that either atelectasis or developing pneumonia was occurring in the right chest. See id. at 204. When asked by plaintiff's counsel about the likelihood of a leak in a revision surgery, Dr. Areno admitted that the risk was greater for revision surgeries. See id. at 209. Plaintiff's counsel later asked:

> If you know that these are signs and symptoms of a leak and you know that a leak is potentially life threatening and you know you have done a revision surgery and that the statistics say that 15 to 18 of 100 people are going to have a leak from this surgery, shouldn't you under those

circumstances have a gastrograffin swallow study done? Id. Dr. Areno answered, "That again depends on Dr. Jones's examination of the patient and review of the data. If he got a chest x-ray and it showed an indication why the patient would be having fever and elevated white count and tachycardia and tachypnea and he treated it and it responded" then Dr. Areno stated that he would defer to Dr. Jones's judgment. Id.

Next to the stand was Dr. Charles Knight ("Dr. Knight"), also a member of the medical review panel, who is board certified in general and vascular surgery. Dr. Knight indicated to the court that he believed Dr. Jones's care and treatment of Mrs. Noahubi met the standard of care. See Record Document 53 at 245. When questioned about Mrs. Noahubi's symptoms of November 12 and 13, Dr. Knight pointed out over that the next four days, Mrs. Noahubi had no tachycardia, no fever spike, and "to postulate that she had a leak back on the 13th and then was completely without those symptoms for four straight days really doesn't make much sense to me." Id. at 283. Dr. Knight questioned why the tachycardia went away if Mrs. Noahubi truly had a leak on those dates. He concluded that since Mrs. Noahubi appeared to get better over the next few days, it was not incumbent upon Dr. Jones to order a gastrograffin swallow study. See id. at 286.

The plaintiff next called to the stand Dr. Gladney, another one of Mrs.

Noahubi's treating physicians, who practices in the areas of general, thoracic and vascular surgery and surgery critical care. Dr. Gladney is board certified in general surgery with added qualifications in surgery critical care and he was tendered by the plaintiff as an expert in thoracic surgery, general surgery, vascular surgery and surgery critical care. Dr. Gladney stated that although he had been dealing with surgical critical care for the last twenty-five years, he could only comment upon many of plaintiff's counsel's questions hypothetically, since he was not present at the time of Mrs. Noahubi's treatment; thus, he concluded that the hypothetical answers did not have much to do with actually practicing medicine. He confirmed that pneumonia or atelectasis could account for the signs and symptoms seen on November 13, explaining that the most common source of fever in the post-operative period is atelectasis or failure to get the lungs expanded. See Record Document 53 at 343. He also confirmed that on November 15, there were no alarming signs or symptoms. See id. at 344. Dr. Gladney unequivocally stated that he did not think that there was a delay in diagnosis on Dr. Jones's part. See id. at 360.

The defendant's expert participated by deposition and by telephone. Dr. George Cowan ("Dr. Cowan"), who has an eighty-nine page curriculum vitae, is board certified in general surgery and has performed bariatric surgery on approximately 4,000 patients. Around 700 of those surgeries were reoperations of

previous bariatric surgical patients. Dr. Cowan testified that Mrs. Noahubi "just wasn't sick enough for somebody who had a leak and especially into the chest all of those days." Defendant's Ex. 15, Deposition of Dr. Cowan at 17-18. He further stated in his deposition that there was not a "high or even a medium probability" of a leak up in the chest and that it was "a low probability, if anything, to an almost impossibility, an unlikelihood for a differential diagnosis." Id. at 82. Dr. Cowan also noted that in his years of practice he had "not seen leaks into the right chest . . . on any of [his] patients following a gastric bypass or revision gastric bypass." Id. at 90. Dr. Cowan thought Dr. Jones "was brilliant in the way he very aggressively worked up this patient and pursued her management." Id. at 93. Dr. Cowan stated that he "went shoulder to shoulder mentally through this chart a couple of times, and [] did not see anything there that [he] would have done differently than Doctor Jones to any significant degree." Id. at 108. Dr. Cowan concluded that he did not just believe, but that he was "certain" that Dr. Jones did not deviate from the standard of care with regard to the treatment that he provided to Mrs. Noahubi. Id. at 108.

The final witness was Dr. Jones. By 2002, Dr. Jones had performed in the vicinity of 3,500 bariatric procedures and had completed about 400 revision surgeries. When asked whether there was anything in Mrs. Noahubi's clinical presentation on November 13 that required him to take her immediately back to surgery, Dr. Jones

answered, "No." Record Document 53 at 496. As of November 16, Dr. Jones's diagnosis was pneumonia. The CT scan indicated that something was occurring in the right lung, which led both Dr. Jones and Dr. Areno to conclude that the issue was pulmonary. Dr. Jones also testified that he had never to his recollection encountered in his practice a leak into the right chest and that he had never seen a patient with a gastric leak whose medical condition continued to improve. See id. at 515-16.

It is clear to the court from the evidence presented that Dr. Jones exercised reasonable care and diligence in the care of Mrs. Noahubi. Based on the testimony of the physicians before the court and the exhibits introduced, the court finds that the standard of care was in no way breached by Dr. Jones with regard to his treatment of Mrs. Noahubi. The testimony overwhelmingly indicated that Mrs. Noahubi's clinical outlook was not deteriorating but improving through November 15. This improvement did not justify additional tests. Because she lived some distance away (Ida Bell, Oklahoma), instead of discharging her, Dr. Jones kept Mrs. Noahubi for further observation. The differences among experts are most apparent on the question of at what point does the doctor decide it is necessary to "go back in" his patient after surgery. Simply stated, Mrs. Noahubi's symptoms did not indicate in either the nursing notes or the doctors' notes that she was a patient with a leak into her abdomen.

Additionally, much has been made by the plaintiff in this case of the alleged failure of Dr. Jones to make a differential diagnosis of Mrs. Noahubi and then through testing eliminate the most serious possible causes of Mrs. Noahubi's condition. However, the court is not swayed by this argument. With a differential diagnosis, a treating physician treats a patient for presenting symptoms as well as orders tests to rule out any causes of such symptoms that may be life-threatening. Here, the plaintiff argues that Dr. Jones's failure to make a differential diagnosis--specifically failing to order a gastrograffin swallow sooner-- and subsequently rule out a leak as a potential life-threatening cause was a breach of the standard of care. However, as noted by Dr. Areno in his testimony, a problem in the right chest is not usually indicative of a gastrojejunal leak. Thus, a differential diagnosis reasonably would not have included that condition. Additionally, the conditions mentioned by the physicians that could cause such symptoms generally are pneumonia and atelectasis, for which Dr. Jones did, in fact, order tests and provide treatment. Dr. Jones adequately addressed the possible serious conditions that were evident at the time from Mrs. Noahubi's chief complaints.

Plaintiff's counsel also characterized this proceeding as a loss of chance case, contending that the delay in diagnosis denied Mrs. Noahubi the chance for a more favorable outcome. The court disagrees. Having found that Dr. Jones was not

negligent in his treatment of Mrs. Noahubi, the court does not find Dr. Jones responsible for a loss of chance of a better outcome for Mrs. Noahubi.

### III. CONCLUSION

While the court is sympathetic towards Mrs. Noahubi's ordeal, the court finds that Mrs. Noahubi failed to prove a breach of the applicable standard of care and causation as required by law for a claim of medical malpractice. Accordingly;

**IT IS ORDERED** that all of Mrs. Noahubi's claims against Dr. Jones be **DISMISSED WITH PREJUDICE.**

A judgment consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DATED AND SIGNED** at Shreveport, Louisiana, this 29th day of August, 2008.



JUDGE TOM STAGG